# EXHIBIT 6

**BC No. 1503399**



**British Virgin Islands**

**The BVI Business Companies Act**

**(No. 16 of 2004)**

**Memorandum and Articles of Association**

**of**

**OILSERV Holding Ltd.**

**Incorporated this 15th day of September 2008**
**as amended on 28 May 2010 and as further amended on 28 May 2010**
**as amended on 23rd September, 2010**

**Rawlinson & Hunter Limited**
**Woodbourne Hall Road Town, Tortola**
**British Virgin Islands**

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**


**THE BVI BUSINESS COMPANIES ACT, 2004**


**MEMORANDUM OF ASSOCIATION**


**OF**


**OILSERV Holding Ltd.**


**1      Company Name**

1.1     The name of the Company is OILSERV Holding Ltd.

1.2     The directors or members may from time to time change the Company's name by Resolution of Directors or Resolution of Members.  The directors shall give notice of such resolution to the registered agent of the Company, for the registered agent to file an application for change of name with the Registrar, and any such change will take effect from the date of the certificate of change of name issued by the Registrar.

1.3     A change of name of the Company shall constitute an amendment of the Memorandum and Articles and in the event of a resolution being passed to change the name of the Company, the provisions below in respect of amendments to the Memorandum and Articles must be complied with.


**2      Company Limited by Shares, Liability of Members**

2.1     The Company is a company limited by shares.

2.2     The liability of each member is limited to:

(a)      the amount from time to time unpaid on that member's shares;

(b)     any liability expressly provided for in the Memorandum or the Articles; and

(c)     any liability to repay a distribution pursuant to section 58(1) of the Act.

**3    Registered Office**

3.1    The first registered office of the Company will be situated at Woodbourne Hall, PO Box 3162, Road Town, Tortola, British Virgin Islands.

3.2    The directors or members may from time to time change the Company's registered office by Resolution of Directors or Resolution of Members, provided that the Company's registered office shall at all times be the office of the registered agent.  The directors shall give notice of such resolution to the registered agent of the Company, for the registered agent to file with the Registrar a notice of change of registered office, and any such change of registered office will take effect from the date of the registration by the Registrar of such notice.

**4    Registered Agent**

4.1    The first registered agent of the Company will be Rawlinson & Hunter Limited of Woodbourne Hall, PO Box 3162, Road Town, Tortola, British Virgin Islands.

4.2    The directors or members may from time to time change the Company's registered agent by Resolution of Directors or Resolution of Members.   The directors shall give notice of such resolution to the registered agent of the Company (meaning the existing registered agent), for the registered agent to file with the Registrar a notice of change of registered agent, and any such change of registered agent will take effect from the date of the registration by the Registrar of such notice.

4.3    If the existing registered agent does not file such notice on instruction by the directors, the directors shall procure that a notice of change of registered agent is filed with the Registrar by a legal practitioner in the British Virgin Islands acting on behalf of the Company, and any such change of registered agent will take effect from the date of the registration by the Registrar of such notice.

**5    General Objects and Powers**

5.1    Subject to the following provisions of this Memorandum, the objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the Act or any other law of the British Virgin Islands.

5.2    The Company has no power to:

(a)    carry on banking or trust business, unless it is licensed to do so under the Banks and Trust Companies Act, 1990;

(b)    carry on business as an insurance or as a reinsurance company, insurance agent or insurance broker, unless it is licensed or authorised to do so under the Insurance Act, 1994;

2

(c)     carry on the business of company management unless it is licensed to do so under the Companies Management Act, 1990;

(d)     carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands unless it is licensed to do so under the Banks and Trust Companies Act, 1990; or

(e)     carry on the business as a mutual fund, mutual fund manager or mutual fund administrator unless it is licensed to do so under the Mutual Funds Act, 1996.

5.3     Without limiting the foregoing, the powers of the Company include the power to do the following:

(a)     grant options over unissued shares in the Company and treasury shares;

(b)     issue securities that are convertible into shares;

(c)     give financial assistance to any person in connection with the acquisition of the Company's own shares;

(d)     issue debt obligations of every kind and grant options, warrants and rights to acquire debt obligations;

(e)     guarantee a liability or obligation of any person and secure any of its obligations by mortgage, pledge or other charge, of any of its assets for that purpose; and

(f)     protect the assets of the Company for the benefit of the Company, its creditors and its members and, at the discretion of the directors, for any person having a direct or indirect interest in the Company.

**6      Maximum Number of Authorised Shares**

6.1     The Company is authorised to issue ordinary shares in the classes set out below:

(a)     an unlimited number of class A shares of no par value each (the **A Shares**) or of other classes of shares with equal or lesser rights;

(b)     210,000,000 class B shares of no par value each (the **B Shares**); and

(c)     1 class C share of no par value (the **C Share**).

6.2     The directors or members may from time to time by Resolution of Directors or Resolution of Members increase the maximum number of shares the Company is authorised to issue, by amendment to the Memorandum in accordance with the provisions below.

**7      Rights Conferred by Shares**

7.1     Each share in the Company confers on the holder:

(a)      the right to one vote on any Resolution of Members (other than the C Share   which carries no voting rights);

(b)      the right to a share in any dividend paid by the Company in accordance with the Act and in accordance with Article 19.7; and

(c)      the right to a share in the distribution of the surplus assets of the Company and in accordance with Article 19.7.

7.2     If at any time the Company is authorised to issue shares of more than one class the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound up, be varied only with the consent in writing of the holders of not less than three-fourths of the issued shares of that class and the holders of not less than three-fourths of the issued shares of any other class of shares which may be affected by such variation.

7.3     The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

**8      Registered Shares Only**

Shares in the Company may only be issued as registered shares and the Company is not authorised to issue bearer shares.  Registered shares may not be exchanged for bearer shares or converted to bearer shares.

**9      Shareholder Further Funding Obligations**

9.1     If the Board determines at any time following First Completion and prior to 15 June 2011 that the Company's resources are insufficient to complete a future project or acquisition that the Board determines meets the investment profile and criteria for the Company and has been approved by the Board pursuant to Article 16.5, then the Board may request that Lime Rock having committed to contribute additional capital in accordance with this Clause 9 contributes such capital (a **Capital Call**) for new additional B Shares (the **New Shares).**  Lime Rock shall be obligated to fund any Capital Call that is not withdrawn prior to funding.

9.2     Each Capital Call shall be made pursuant to a capital call notice in writing (a **Capital Call Notice**) executed by any of the chief executive officer, the chief financial officer or a Director. Each Capital Call Notice shall:

(a)     specify in reasonable detail the purpose for which the Capital Call is required (including the investment case);

(b)     include a statement of the amount which is required to be funded by Lime Rock (the **Relevant Amount**);

(c)     provide for the Relevant Amount to be paid in a single contribution or in multiple contributions over time; and

(d)     specify the time or times required for funding the Relevant Amount which shall be at least 15 days following the date of the Capital Call Notice.

9.3     The Board shall have the authority to withdraw any Capital Call Notice at any time prior to the time that funding is required thereunder.

**10     Reserved Matters**

10.1    The following actions by the Company shall require approval of the majority of all Directors, which approval must, for the purposes of this Clause 10.1, include the approval of at least two B Directors as long as the holders of the B Shares hold the Requisite B Percentage (each a **Board Reserved Matter**):

(a)     adopt or approve any Budget, or materially amend any Budget if such amendment would increase the capital expenditure and overall value of the Budget by more than 20% for any Financial Year (or part thereof) up to and including 2012 and by more than 10% for any Financial Year after the year 2012;

(b)     register the transfer of Shares other than Shares issued pursuant to a Permitted Capital Increase or Shares issued or transferred as otherwise expressly permitted in this Memorandum or the Articles;

(c)     enter into capital commitments or incur indebtedness (which for this purpose shall include hire purchase, leasing, factoring and invoice discounting commitments), whether in connection with a single purchase or acquisition or a series of related transactions, that exceed the applicable capital expenditure budgeted for that transaction as specified in the Budget by more than 20% for any Financial Year (or part thereof) up to and including 2012 and by more than 10% for any Financial Year after the year 2012;

(d)     enter into any agreement with a Shareholder, the Founder, or an Affiliate of either of the foregoing, or make any payment or give any guarantee on behalf of a Shareholder, the Founder, or an Affiliate of either of the foregoing that is not on an arm's length basis;

(e)     acquire (whether by purchase, subscription or otherwise) any share of, or enter into any partnership or joint venture agreement or merger with any body corporate in each case

5

involving payments by the Company and/or any of its Subsidiaries in excess of, US$20,000,000;

(f)     terminate any participation in, any partnership or joint venture in each case having a value of, or involving payments by the Company and/or any of its Subsidiaries in excess of US$20,000,000;

(g)     transfer or otherwise dispose of shares in any Subsidiary if such transfer is in excess of 49% of the issued and outstanding shares in the Subsidiary and on condition that such transfer or disposal has a value of, or involves payments by the Company and/or any of its Subsidiaries in excess of US$20,000,000;

(h)     make any application or submission of any business plan to any person with a view to attracting additional or substitute finance for the Group or any part of it other than in the normal course of business;

(i)     establish any pension scheme, share option scheme, employee share scheme or any profit sharing scheme or vary or discontinue any of the same (other than any bonus schemes);

(j)     agree to any material variation or amendment to the terms of any financing or funding arrangement or to any documents, consents, mandates or rights relating thereto in each case having a value of, or involving payments in excess of US$20,000,000;

(k)     guarantee indebtedness in excess of US$20,000,000 in the aggregate but excluding (i) any such indebtedness between the Company and any of its Subsidiaries or between two of the Company's Subsidiaries; and (ii) in respect of performance bonds required to be issued in connection with oilfield service contracts in the ordinary course of business;

(l)     create or redeem any debenture, mortgage, charge, lien or other security outside the ordinary course of business;

(m)     appoint or change its Auditors or its accounting policies, practices or bases used in the preparation of its audited accounts save for changes required by law;

(n)     terminate or appoint or change the responsibilities or the terms of appointment of the chief financial officer of the Company; terminate the appointment of the Founder as chief executive officer of the Company; or terminate or appoint any other chief executive officer of the Company;

(o)     begin, conduct or settle any litigation, arbitration or mediation proceedings except for: (i) debt collection conducted in the normal course of trading; or (ii) proceedings where the amount claimed does not exceed US$5,000,000;

(p)      approving, adopting, expanding, or extending any Delegation of Authority in a Board Reserved Matter; or

(q)      enter into any agreement or otherwise commit to do any of the foregoing,

provided that where a matter which would otherwise require approval under this Clause has been expressly included in the Budget and/or the Delegation of Authority approved by the Board in accordance with this Clause, no further approval shall be required under this Clause. To the extent that the holders of B Shares cease to hold the Requisite B Percentage, the reserved matters provided for within this Clause 10.1 will cease to be Board Reserved Matters and may be approved by a simple majority of the Directors.

10.2    Subject to the terms of this Clause 10.2, the following actions by the Company and any of its Subsidiaries shall require approval by vote or written consent of the holders of at least 65% of the B Shares as long as the holders of the B Shares hold the Requisite B Percentage (each an **Investor Reserved Matter**):

(a)      alter its financial year end;

(b)      alter its name;

(c)      amend, modify or repeal this Memorandum or the Articles other than in relation to any Permitted Capital Increase (including by means of any merger or consolidation of the Company with or into any other body corporate) in a manner that would adversely alter or change or otherwise adversely affect the preferences, rights, privileges or powers of, or the restrictions provided for the benefit of, the holders of the B Shares or the holder of the C Share, or increase or decrease the number of authorized B Shares or C Share;

(d)      authorize, issue or create any obligation to issue shares or any equity security having parity with (save for B Shares issuable pursuant to Clause 9.1) or any preference or priority superior to any preference or priority of the B Shares or the C Share, including securities exercisable into equity securities or reclassification of existing shares;

(e)      reduce, redeem or otherwise reorganize its shares including, without limitation, any redemption of B Shares or the C Share;

(f)      save for any Permitted Capital Increase, create any options or other rights to subscribe for or to convert into Shares other than as permitted under this Memorandum or the Articles or the issuance of B Shares pursuant to Clause 9.1;

(g)      pay or declare any dividend or make any other distribution or payment out of the distributable reserves or reduce any other reserve of the Company or any of its Subsidiaries (other than repurchases of any equity interests from employees pursuant to repurchase rights arrangements with such employees or repurchases of any such interests pursuant to the exercise of contractual rights of first refusal over such interests);

(h)     pass any resolution to voluntarily liquidate, wind itself up or dissolve itself;

(i)     sell, transfer, lease, license or otherwise dispose of (including by way of merger or consolidation) the whole or any substantial part (i.e. more than 30%) of its Business, undertaking or assets (including any Subsidiary) whether by a single transaction or series of transactions, related or not other than to another member of its Wholly-Owned Group. For the avoidance of doubt, the 30% test relates to the value of the entire Business of the Company's Group at such time;

(j)     reorganise or change the nature or scope of its Business or cease or enter into a new line of business; or

(k)     enter into any agreement or otherwise commit to do any of the foregoing.

At any time when any B Shares remain outstanding and the holders of the B Shares cease to hold the Requisite B Percentage, none of the actions set out in clauses 10.2(c), 10.2(d) and 10.2(e) may be effected without the prior approval by vote or written consent of the holders representing at least 50% of the issued and outstanding B Shares.

## 11      Amendments to the Memorandum and Articles

11.1    Subject to the provisions of the Act and Clause 10.2 of the Memorandum, the directors or members may from time to time amend the Memorandum or Articles by Resolution of Directors or Resolution of Members.  The directors shall give notice of such resolution to the registered agent of the Company, for the registered agent to file with the Registrar a notice of the amendment to the Memorandum or Articles, or a restated memorandum and articles of association incorporating the amendment(s) made, and any such amendment to the Memorandum or Articles will take effect from the date of the registration by the Registrar of the notice of amendment or restated memorandum and articles of association incorporating the amendment(s) made.

11.2    The directors shall not have the power to amend the Memorandum or Articles:

(a)     to restrict the rights or powers of the members to amend the Memorandum or Articles;

(b)     to change the percentage of members required to pass a resolution to amend the Memorandum or Articles; or

(c)     in circumstances where the Memorandum or Articles may only be amended by the members.

11.3    A change of registered office or registered agent shall not constitute an amendment of the Memorandum or Articles.

8

11.4    An amendment to the Memorandum or Articles which would have the effect of varying the rights of the holders of a class of shares may only be made in accordance with the provisions of the Memorandum and Articles relating to the variation of class rights.

## 12    Definitions and Interpretation

12.1    In this memorandum of association and the attached articles of association:

| | |
|---|---|
| "**A Directors**" | means the directors of the Company elected by the holders of, or from among the nominees designated by the holders of, the A Shares from time to time; |
| "**A Shares**" | has the meaning given to it in Clause 6.1(a) of the Memorandum; |
| "**Accepting Transferee**" | has the meaning given in Article 4(3)(e)(ii) |
| "**Act**" | means the BVI Business Companies Act, 2004; |
| "**Additional Completion(s)**" | means the issuance of the additional B Shares by the Company to any Investor on or before 31 December 2011 on the terms and conditions of the Memorandum and Articles; |
| "**Additional Shares**" | has the meaning given in Article 2.2(b); |
| "**Affiliate**" | means: |

(a)    in relation to any person other than the Investors, any Subsidiary or Ultimate Holding Company of that person and any other Subsidiary of that Ultimate Holding Company;

(b)    in relation to any Shareholder who is a natural person, the spouse, parents, siblings and direct descendents of such Shareholder (**Relevant Person**) or trusts for the benefit of such Shareholder or charitable trusts established by such Shareholder or any of the foregoing or any person that directly or indirectly, through one or more intermediaries, is Controlled by, under the

9

|  | common Control with, such Shareholder or the Relevant Persons; |
|---|---|
| (c) | in relation to the Investors, any fund related to the Investors or their respective Ultimate Holding Company (excluding, for the avoidance of doubt, any portfolio companies of such funds), |

provided always that the Company shall not be regarded as being an Affiliate of any Shareholder for the purposes of the Memorandum or Articles;

|  |  |
|---|---|
| **"Articles"** | means the Company's articles of association as attached to this Memorandum,  and "Article" shall be construed accordingly; |
| **"Auditors"** | means the auditors for the time being of the Company; |
| **"B Director"** | means the director of the Company elected following their nomination by the holders of, or from among the nominees designated by the holders of, the B Shares from time to time; |
| **"B Shares"** | has the meaning given to it in Clause 6.1(b) of the Memorandum; |
| **"Board"** | means the board of directors for the time being of the Company; |
| **"Board Reserved Matter"** | means each of the matters in  Clause 10.1 of the Memorandum; |
| **"Budget"** | means the budget from time to time of the Company and its Subsidiaries (if any) approved by the Board in accordance with the provisions of the Articles; |
| **"Business"** | means the business of the Company and its Subsidiaries (if any) as carried out at the date of the Memorandum and Articles and such other business as the Shareholders may agree shall be conducted by the Company from time to time, provided that such business shall not conflict with the provisions of the objects and |

10

|  | powers of the Company under the Memorandum or the Articles; |
|---|---|
| **"Business Day"** | means a day (other than a Friday, Saturday or Sunday) on which banks are generally open in the British Virgin Islands and the Republic of Iraq for normal business; |
| **"C Share"** | has the meaning given to it in Clause 6.1(c) of the Memorandum; |
| **"Capital Call"** | has the meaning given in Clause 9.1 of the Memorandum; |
| **"Capital Call Notice"** | has the meaning given in Clause 9.2 of the Memorandum; |
| **"Capital Invested"** | means the total equity invested by an Investor in the Company from time to time, by way of subscription for B Shares, which is in each case calculated up to and including the date of the return of capital under Article 19.7; |
| **"Catch Up"** | has the meaning given in Article 19.7(a)(ii); |
| **"Class B Distribution Preference"** | has the meaning given in Article 19.7(a)(i); |
| **"Co-Investor"** | means one or more investors other than Lime Rock Partners V, L.P. that have subscribed for and purchased B Shares on the terms and conditions of the Memorandum and Articles; provided that each Co-Investor must commit to purchase at least US$5,000,000 of B Shares; |
| **"Control"** | means with respect to any person, the possession directly or indirectly of the power to direct or cause the direction of the management of that person, whether by or through ownership of shares, securities, partnership or other ownership interests or membership interests, agreement or otherwise, provided that if one person owns, directly or indirectly, 50% or more of the shares or share capital (as applicable), voting securities, partnership or other ownership interests or membership interests of another person, such person shall be deemed to Control such other person and **Controlled** and under the **common Control with** shall be construed accordingly; |

11

| | |
|---|---|
| "**Delegation of Authority**" | means the delegation of authority of the Company from time to time approved by the Board; |
| "**Directors**" | means the A Directors or the B Directors and **Director** means any of them; |
| "**Election Period**" | has the meaning given in Article 2.2(d); |
| "**Encumber**" | means creating or allowing to exist or agreeing to create or agreeing to allow to exist any mortgage, charge (fixed or floating), pledge, lien, option, right to acquire, option or right of pre-emption or refusal, right of sale, share in proceeds or revenue or repurchase, assignment by way of security or trust arrangement for the purpose of providing security or other security interest of any kind; |
| "**Excess Shares**" | has the meaning in Article 4.3(e)(ii) |
| "**Excluded Issuance**" | means the issuance of: (a) additional Shares to the contributing Shareholders pursuant to funding by such contributing Shareholders of a Capital Call; (b) options to purchase Shares pursuant to incentive equity plans approved by the Shareholders in accordance with Clause 10.2; (c) any Shares issued to any person that is not a Shareholder or Affiliate of a Shareholder as consideration in any acquisition, merger or similar business combination approved in accordance with this Agreement; (d) the conversion of the C Share immediately prior to an IPO pursuant to these Articles; and (e) any Shares issued in connection with an IPO; |
| "**Financial Year**" | means a financial year of the Company ending on 31 December or any other financial year agreed by the Shareholders in accordance with the Memorandum and Articles; |
| "**First A Director**" | has the meaning given in Article 16.4; |
| "**First B Director**" | has the meaning given in Article 16.4; |
| "**First Completion**" | means the date upon which the Company first issues B Shares to the proposed holders of the B Shares; |

| | |
|---|---|
| "**First Notice**" | has the meaning given in Article 2.2(c); |
| "**Founder**" | means the person defined as such in any written agreement amongst all of the Shareholders; |
| "**Group**" | means in relation to any Party, it and its Affiliates; |
| "**Inclusion Notice**" | has the meaning given in Article 4.4(b); |
| "**Inclusion Right**" | has the meaning given in Article 4.4(c); |
| "**Initial A Period**" | has the meaning given in Article 4.1(a)(i); |
| "**Initial B Period**" | has the meaning given in Article 4.1(a)(ii); |
| "**Interest**" | includes: |



(a)    in relation to any Shareholder, any direct or indirect financial or commercial interest of that Shareholder or its Affiliates (that may be different from the interest of the other Shareholder(s)) arising from any existing or proposed arrangement, contract, litigation or other proceedings between the Company on the one hand and that Shareholder and any of its Affiliates on the other; and

(b)    in relation to any Director, any Interest of the Shareholder which nominated him or any interest of the Director in his personal capacity;

| | |
|---|---|
| "**Investors**" | means Lime Rock Partners V, L.P., as holder of B Shares together with any Co-Investor; |
| "**Investor Reserved Matters**" | means each of the matters in Clause 10.2 of the Memorandum; |
| "**IPO**" | means the admission to trading or permission to deal on such regulated investment exchange as is nominated by the Board becoming effective in relation to any of the Shares after |

|  | appropriate change of the corporate form of the Company (or the shares in a holding company of the Company, in which the share structure of and the economic and voting rights in the Company is replicated in all material respects); |
|---|---|
| **"Issue Value"** | means the value attributed to each Share for the purpose of participation of Lime Rock, being US$0.50; |
| **"Lime Rock"** | means Lime Rock Partners V, L.P., an exempted limited partnership formed and registered under the laws of the Cayman Islands under registration number 25110, whose registered office is at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands; |
| **"Memorandum"** | means this, the Company's memorandum of association; |
| **"New Shares"** | has the meaning given in Clause 9.1 of the Memorandum; |
| **"Offered Shares"** | has the meaning given in Article 4.3(b)(i); |
| **"Offer Period"** | has the meaning given in Article 4.3(c); |
| **"Over-Allotment Amount"** | has the meaning given in Article 2.2(d); |
| **"Permitted Capital Increase"** | means any capital increase in which the Board decides by a Resolution of Directors to issue and the Company offers to the Shareholders new Shares pro rata to their respective percentage shareholding in the Company at a fair market value and with no more rights than those attached to the A Shares and with any such Shares being then offered to third parties if and to the extent any Shareholder fails to subscribe for its pro rata allocation of Shares; provided that in no event may such capital increase result in an issue of new Shares having parity with or any preference or priority superior to any preference or priority of the B Shares or the C Share; |
| **"Post-tax Profits"** | means in respect of any Financial Year the audited post-tax profit of the Company as shown in the audited profit and loss account of the Company for that Financial Year; |

14

"**Pre-emption Rights**"

has the meaning given in Article 2.2(b);

"**Registrar**"

means the Registrar of Corporate Affairs appointed under the Act;

"**Relevant Amount**"

has the meaning given in Clause 9.2(b) of the Memorandum;

"**Requesting Purchaser**"

has the meaning given in Article 2.2(d);

"**Requisite B Percentage**"

means at the relevant time, that the issued and outstanding B Shares represent:

(a) 20% or more of the total issued and outstanding Shares, if the Investors have transferred or otherwise disposed of any B Shares to third parties (other than transfers or disposals in accordance with Article 4.2(b)(i) or 4.2(b)(iii)); or

(b) 15% or more of the total issued and outstanding Shares, if the Investors have not transferred or otherwise disposed of any B Shares to third parties (other than transfers or disposals in accordance with Article 4.2(b)(i) or 4.2(b)(iii)); or

(c) 10% or more of the total issued and outstanding Shares until such time as the Company has issued Capital Call(s) to Lime Rock Partners V, L.P. in an aggregate amount of US$20,000,000 and the applicable funding period has passed;

"**Resolution of Directors**"

means a resolution by the majority of the directors of the Company passed either at a meeting of directors, or by way of a Written Resolution, in either case in accordance with the provisions of the Articles;

"**Resolution of Members**"

means a resolution by the members holding a majority of the voting rights in respect of such resolution passed either at a meeting of members, or by way of a Written Resolution, in either case in accordance with the provisions of the Articles;

"**Shareholders**"

means any person whose name is entered in the share register of the Company as the holder of one or more Shares or fractional Shares and

15

| | |
|---|---|
| | a **Shareholder** means any of them; |
| "**Shares**" | means shares in the Company; |
| "**Shareholder Transfer**" | has the meaning given to it in Article 4.3(e)(i); |
| "**Specified Price**" | has the meaning given to it in Article 4.3(b)(iv); |
| "**Stanhope**" | means Stanhope Investments, a company incorporated under the laws of the Cayman Islands whose registered office is at Walkers House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands; |
| **"Subscription value**" | means the value attributed to each Share for the purpose of any Additional Completion which must be equal to or greater than the Issue Value; |
| **"Subsidiary**" | has the meaning given to it under the Act; |
| "**Tag Offeree**" | has the meaning given in Article 4.4(a); |
| "**Tag Offeror**" | has the meaning given in Article 4.4(a); |
| "**Target Amount**" | means an amount equal to US$245,000,000 plus the Capital Invested up to a maximum of US$350,000,000; |
| "**Third Party Transfer**" | has the meaning given in Article 4.3(e)(v)(B); |
| "**Transfer Notice**" | has the meaning given in Article 4.3(a); |
| "**Transferees**" | has the meaning given in Article 4.3(a); |
| "**Transferor**" | has the meaning given in Article 4.2(b); |
| "**Ultimate Holding Company**" | means a holding company which is not also a Subsidiary; |
| "**Wholly-Owned Group**" | means a body corporate and any Holding Company of which it is a Wholly-Owned Subsidiary and any other Wholly-Owned Subsidiaries of that Holding Company (including any Wholly-Owned Subsidiary of the body corporate); and |
| "**Wholly-Owned Subsidiary**" | means a company is a Wholly-Owned Subsidiary of another company if it has no members except that other company and that |

other's Wholly-Owned Subsidiaries or persons acting on behalf of that other or its Wholly-Owned Subsidiaries.

12.2    In the Memorandum and Articles:

(a)    words and expressions defined in the Act shall have the same meaning and, unless otherwise required by the context, the singular shall include the plural and vice versa, the masculine shall include the feminine and the neuter and references to persons shall include corporations and all entities capable of having a legal existence;

(b)    reference to a provision of law is a reference to that provision as extended, applied, amended or re-enacted and includes any subordinate legislation;

(c)    the headings are for convenience only and shall not affect the construction of the Memorandum or Articles;

(d)    reference to a thing being "**written**" or "**in writing**" includes all forms of writing, including all electronic records which satisfy the requirements of the Electronic Transactions Act, 2001;

(e)    reference to a thing being "**signed**" or to a person's "**signature**" shall include reference to an electronic signature which satisfies the requirements of the Electronic Transactions Act, 2001, and reference to the Company's "**seal**" shall include reference to an electronic seal which satisfies the requirements of the Electronic Transactions Act, 2001.

17

We, Rawlinson & Hunter Limited of Woodbourne Hall , PO Box 3162, Road Town, Tortola, British Virgin Islands in our capacity as registered agent for the Company hereby apply to the Registrar for the incorporation of the Company this 15th day of September 2008.

Incorporator

(Sgd) Lori-Jean Stevens
_____
Lori-Jean Stevens
Authorised Signatory
Rawlison & Hunter Limited



**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE BVI BUSINESS COMPANIES ACT, 2004**

**ARTICLES OF ASSOCIATION**

**OF**

**OILSERV Holding Ltd.**

# 1     Share Certificates

1.1     Every person whose name is entered as a member in the share register, being the holder of registered shares, shall without payment (except where otherwise noted) be entitled to a share certificate in the following circumstances:

        (a)     on the issuance of such shares to such member;

        (b)     on the transfer of such shares to such member;

        (c)     on a re-designation or conversion of such shares with the effect that the certificate previously issued no longer properly describes such shares; and

        (d)     at the discretion of the directors (who may levy a reasonable charge), on notice to the Company of a change of name of the member.

1.2     Such certificate shall be signed by a director or under the common seal of the Company (which the registered agent of the Company is authorised to affix to such certificate) with or without the signature of any director or officer of the Company specifying the share or shares held and the par value thereof (if the Company is authorised at the relevant time to issue shares with a par value), provided that in respect of shares held jointly by several persons, the Company shall not be bound to issue more than one certificate and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all.

1.3     If a certificate is worn out or lost it may, subject to the prior written consent of any mortgagee or chargee whose interest has been noted on the register of members, be renewed on production of the worn out certificate, or on satisfactory proof of its loss together with such indemnity as the directors may reasonably require.  Any member receiving a share certificate shall indemnify and hold the Company and its officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession of such a certificate.

**2      Issue of Shares**

2.1    Subject to the provisions of the Memorandum and these Articles, including Article 2.2, the unissued shares of the Company (whether forming part of the original or any increased authorised shares) shall be at the disposal of the directors who may offer, allot, grant options over or otherwise dispose of them to such persons at such times and for such consideration, being not less than the par value (if any) of the shares being disposed of, and upon such terms and conditions as the directors may determine.  Such consideration may take any form acceptable to the directors, including money, a promissory note, or other written obligation to contribute money or property, real property, personal property (including goodwill and know-how), services rendered or a contract for future services. Before issuing shares for a consideration other than money, the directors shall pass a Resolution of Directors stating:

(a)    the amount to be credited for the issue of the shares;

(b)    their determination of the reasonable present cash value of the non-money consideration for the issue; and

(c)    that, in their opinion, the present cash value of the non-money consideration for the issue is not less than the amount to be credited for the issue of the shares.

2.2    Pre-emption Rights

(a)    The Company may, by a Resolution of Directors and as an exception to Clause 10.2(d) of the Memorandum, issue in one or several tranches a total of up to 105,000,000 additional B Shares to Co-Investors at the Subscription Value, provided that the Company has first offered to issue and sell such additional B Shares to Lime Rock (or at its option, an Affiliate of Lime Rock). The Company shall give Lime Rock written notice that shall specify the number of additional B Shares (the "**Offered B Shares**"), the name and identity of the prospective Co-Investor; the date upon which the proposed subscription by the prospective Co-Investor is to be completed (which shall be a date falling not less than 30 calendar days after the date of the notice); the aggregate purchase price; and a copy of the proposed purchase agreement to be entered into with the prospective Co-Investor and shall invite Lime Rock to notify the Company, whilst the offer remains open, whether Lime Rock or its Affiliate(s) is willing to purchase all such Offered B Shares on such terms. The offer to Lime Rock or its Affiliate(s) shall remain open for a period of 15 calendar days. If Lime Rock does not notify the Company that it or its Affiliates wish to purchase all the Offered B Shares before the expiry of the offer period, it will be deemed to have notified the Company that it does not wish to subscribe for the Offered B Shares and the Company may issue such Offered B Shares to the proposed Co-Investor within 60 calendar days following the expiry of the offer period pursuant to the terms of the proposed purchase agreement. If Lime Rock does notify the Company that it or its Affiliates wish to purchase all the Offered B Shares before the expiry of the offer period, it will be bound to pay the purchase price for, and to accept a transfer of, all the Offered Shares and the Company shall be bound, on payment of the purchase price, to transfer all such Offered Shares to Lime Rock or its Affiliates within 15 days following the expiry of the offer period pursuant to the terms of the proposed purchase agreement.

(b)    Following First Completion and Additional Completion(s) and the payment of all Capital Call(s) by the Investors in accordance with the terms of the Memorandum, the

Company may issue additional shares (the **Additional Shares**). If the Company, having passed the necessary Board and Shareholder resolutions, decides to issue Additional Shares, which shall include all Shares issued after First Completion and Additional Completion(s) other than Excluded Issuances, then the Company, through the Board, shall first offer the Additional Shares pro rata to the Shareholders (the **Pre-emption Rights**) pursuant to this Article 2.2.

(c)    The Board shall give each Shareholder written notice (the **First Notice**) of its intention, describing the class of Additional Shares, the price, and the general terms upon which the Company proposes to issue the same.  Each Shareholder shall have the right to purchase its pro rata share of such Additional Shares (which pro rata share shall be calculated as of the date of the First Notice) at the price and upon the terms specified in the First Notice.

(d)    If a Shareholder wishes to exercise its Pre-emption Rights, it must do so by delivering an irrevocable written notice to the Company within 30 days after delivery by the Company of the First Notice (the **Election Period**), which notice shall state the dollar amount of Additional Shares such Shareholder (each a **Requesting Purchaser**) would like to purchase up to a maximum amount equal to such Shareholder's pro rata share of the total offering amount plus the additional dollar amount of Additional Shares such Requesting Purchaser would like to purchase in excess of its pro rata share (the **Over-Allotment Amount**), if any, if other Shareholders do not elect to purchase their full pro rata share of the Additional Shares.  The rights of each Requesting Purchaser to purchase a dollar amount of Additional Shares in excess of each such Requesting Purchaser's pro rata share of the Additional Shares shall be based on the relative pro rata share of the Additional Shares of those Requesting Purchasers desiring Over-Allotment Amounts and not based on the Requesting Purchasers' relative Over-Allotment Amounts.

(e)    If not all of the Additional Shares are purchased by the Shareholders, the Company shall have the right, but shall not be required, to issue and sell the un-purchased portion of the Additional Shares to a third party at any time during the 120 days following the termination of the Election Period pursuant to the terms and conditions set out in the First Notice.  The Board may, in its reasonable discretion, impose such other reasonable and customary terms and procedures such as setting a closing date, rounding the number of Shares covered by this Article 2.2 to the nearest whole Share and requiring customary closing deliverables in connection with any Pre-emption Rights offering.

(f)    If the Company has not issued and sold such Additional Shares within the 120 day period under Article 2.2(e), the Company shall not thereafter issue or sell any Shares without first offering such securities pro rata to the Shareholders in accordance with this Article 2.2.

(g)    Notwithstanding anything to the contrary in this Article 2.2, the provisions of this Article 2.2 shall terminate and be of no further force or effect upon the consummation of an IPO.

2.3    Subject to the provisions of the Act in this regard, shares may be issued on the terms that they are redeemable, or at the option of the Company be liable to be redeemed on such terms and in such manner as the directors before or at the time of the issue of such shares may determine.

2.4     The Company may issue bonus shares, partly paid shares and nil paid shares.

2.5     The Company may not redeem B Shares or the C Share.

2.6     Except as required by the Act, and notwithstanding that a share certificate may refer to a member holding shares "as trustee" or similar expression, no person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any share or any interest in any fractional part of a share or (except as provided by these Articles or by the Act) any other rights in respect of any share except any absolute right to the entirety thereof by the registered holder.

**3       Forfeiture of Shares**

3.1     The Company may, at any time after the due date for payment, serve on a member who has not paid in full for shares registered in the name of that member, a written notice of call (**Notice of Call**) specifying a date for payment to be made.  The Notice of Call shall name a further date not earlier than the expiration of 14 days from the date of service of the Notice of Call on or before which the payment required by the Notice of Call is to be made and shall contain a statement that in the event of non-payment at or before the time named in the Notice of Call the shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

3.2     Where a written Notice of Call has been issued under the foregoing Article and the requirements of the Notice of Call have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the shares to which the Notice of Call relates. The Company is under no obligation to refund any moneys to the member whose shares have been cancelled pursuant to this Article and that member shall be discharged from any further obligation to the Company.

**4       Transfer of Shares**

4.1     General

        (a)     Except as expressly permitted or required in accordance with the terms of the Memorandum and these Articles:

                (i)     no holder of A Shares may transfer or otherwise dispose of or Encumber any of its A Shares or any interest in any of its A Shares for a period of five years from 31 May 2010 (the, **Initial A Period**); and

                (ii)    no holder of B Shares may transfer or otherwise dispose of or Encumber any of its B Shares or any interest in any of its B Shares for a period of three years from 31 May 2010 (the **Initial B Period**).

        (b)     No Shareholder may, except as expressly required or permitted by this Article 4, transfer or otherwise dispose of or Encumber any of its Shares or any interest in any of its Shares. Any purported transfer or other disposal of any Shares or interest in any Shares shall be  null and void and of no force or effect, and the Company shall not

4

recognise or be bound by any such purported transfer or other disposal and shall not effect any such transfer or other disposal on the transfer books of the Company.

(c)    The restrictions on transfer contained in this Article 4 shall apply to all transfers operating by law or otherwise.

(d)    The Shareholders agree that the restrictions contained in this Article 4 are fair and reasonable and in the best interests of the Company and the Shareholders.

4.2    Permitted transfers

(a)    Except as provided in Articles 4.2(b), 4.2(c) and 4.4 or in respect of an Excluded Issuance, no Shareholder shall be entitled to transfer or otherwise dispose of its Shares without first offering them for transfer to the other Shareholders. For the avoidance of doubt, the transfer restrictions contained in this Article 4 shall not apply to Shares issued in respect of an Excluded Issuance for their initial issuance but shall apply thereafter to any subsequent transfers thereof.

(b)    Any Shareholder (the **Transferor**) may transfer at any time all or part only of its Shares:

    (i)    to another member of its Wholly-Owned Group; or

    (ii)    to a person approved in writing by each of the Investors and the Founder; or

    (iii)    with respect to the Investors, to an Affiliate of the Investors.

(c)    If the entity holding Shares transferred to it under Article 4.2(b) is about to cease to be a member of the Wholly-Owned Group to which it currently belongs, it shall without delay and prior to it so ceasing to be a member notify the Company and the other Shareholders that such event will occur and shall transfer those Shares to a member of its current Wholly-Owned Group.

4.3    Transfer Procedure

(a)    Following the expiry of the Initial A Period or the Initial B Period, as applicable, a Transferor who wishes to transfer Shares (other than as permitted in Articles 4.2(b) or 4.2(c)) shall give notice to the other Shareholders (including the Investors) (the **Transferees**) in accordance with Article 4.3(b) (a **Transfer Notice**).

(b)    A Transfer Notice shall specify:

    (i)    the Shares offered (which shall constitute all or part only of the Shares owned by the Transferor) (the **Offered Shares**);

    (ii)    the name and identity of the prospective purchaser;

(iii)    the date upon which the proposed transfer to the prospective purchaser is to be completed, which shall be a date falling not less than 45 Business Days after the date of the Transfer Notice; and

(iv)    the price in cash at which they are offered (the **Specified Price**),

and shall invite the Transferees to notify the Transferor whilst the offer remains open whether they are willing to purchase the Offered Shares.  A copy of the Transfer Notice shall be served on the Company.

(c)    A Transfer Notice may not be revoked, and the offer shall remain open for a period of 15 calendar days from the date of the Transfer Notice (the **Offer Period**).

(d)    If any Transferee does not notify the Transferor that it wishes to purchase the Offered Shares before the expiry of the Offer Period, then that Transferee shall be deemed to have notified the Transferor that it does not wish to purchase the Offered Shares.

(e)    On the expiry of the Offer Period:

(i)    subject to Article 4.3(e)(ii) and 4.3(e)(v), if all  the Transferees have notified the Transferor that they wish to purchase the Offered Shares, those Transferees shall be bound to pay the purchase price for, and to accept a transfer of, the Offered Shares (pro rata to their percentage shareholdings in the Company at that time or as otherwise agreed by those Transferees) and the Transferor shall be bound, on payment of the purchase price, to transfer such Offered Shares to the Transferees in accordance with Articles 4.3(f) to 4.3(h) inclusive (the **Shareholder Transfer**);

(ii)    if more than one but not all the Transferees have notified the Transferor that they wish to purchase the Offered Shares (the **Accepting Transferee(s)**) or if one or more Accepting Transferees has indicated that it does not wish to purchase its entire pro rata share of the Offered Shares, the Transferor shall as soon as practicable (and, in any event, not later than five Business Days after the expiry of the Offer Period) give a further written notice (the **Secondary Transfer Notice**) to the Accepting Transferee(s), offering (the **Secondary Offer**) those Shares which have not been taken up under the offer made in the Transfer Notice (the **Secondary Offer Shares**) on the same terms and conditions as the offer made in the Transfer Notice and, for a period of five Business Days from the date of the Secondary Transfer Notice, the Accepting Transferee(s) may notify the Transferor that it wishes to acquire the Secondary Offer Shares in excess of its pro rata share of the Offered Shares (the **Excess Shares**), provided that the Accepting Transferee(s) shall not be obliged to accept a transfer of more than the number of Shares indicated in its acceptance of the Secondary Offer. The rights of each Accepting Transferee to purchase the Secondary Offer Shares in excess of its pro rata share of the Offered Shares shall be based on the relative pro rata share of the Secondary Offer Shares of those Accepting Transferee(s) desiring additional Offered Shares and not based upon the Accepting Transferee(s) relative Excess Shares;

6

(iii)    subject to Articles 4.3(e)(iv) and 4.3(e)(v), if the Accepting Transferee(s) has(ve) notified the Transferor that it or they wish(es) to accept the Secondary Offer Shares, the Accepting Transferee(s) shall be bound to pay the purchase price for, and to accept a transfer of, the Shares offered in the Secondary Offer which it or they has(ve) agreed to purchase and the Transferor shall be bound, on payment of the purchase price, to transfer such Shares to the Accepting Transferee(s) in accordance with Article 4.3(f) to 4.3(h) inclusive;

(iv)    in the event that after the Secondary Offer the Accepting Transferee(s) does not elect to acquire all the Shares offered by the Transferor, the Transferor shall have the option to transfer:

(A)    to the Accepting Transferee(s) the Shares it or they elected to acquire pursuant to Articles 4.3(e)(i) and 4.3(e)(ii) and transfer the remaining Shares to the prospective purchaser set out in the Transfer Notice pursuant to Article 4.3(e)(v); or

(B)    to the prospective purchaser set out in the Transfer Notice all of the Offered Shares pursuant to Article 4.3(e)(v);

(v)    pursuant to Article 4.3(e)(iv), the Transferor may transfer:

(A)    any Offered Shares not taken up under the offer made in the Transfer Notice or the Secondary Transfer Notice, as the case may be; or

(B)    all the Offered Shares to the prospective purchaser set out in the Transfer Notice on the date specified in the Transfer Notice, at a price not less than, and on the terms and conditions no more favourable than, the price, terms and conditions set out in the Transfer Notice, provided that any such Shares are to be transferred under a bona fide sale for the purchase price stated in the Transfer Notice without any deduction, rebate or allowance to the prospective purchaser (the **Third Party Transfer**). The costs of a Third Party Transfer shall be borne by the Transferor.

(f)    Any Shareholder Transfer made in accordance with the terms of this Article 4.3 shall be for the price and on the terms and conditions set out in the Transfer Notice, and shall be completed by the date specified in the Transfer Notice as the date upon which the proposed transfer was to be completed provided that the Transferor shall at a minimum make customary representations and warranties concerning:

(i)    such Transferor's valid ownership of the Shares, free and clear of all encumbrances;

(ii)    such Transferor's authority, power and right to enter into and complete the sale of the Shares without violating any other agreement to which such Transferor is a party or its assets are bound; and

(iii)    compliance with applicable laws.

7

(g)     The Shareholders involved in a Shareholder Transfer shall execute and deliver all documents necessary to give effect to the Shareholder Transfer of the Shares to the acquiring Shareholders.

(h)     The costs of a Shareholder Transfer (including escrow costs and attorney fees reasonably incurred by the Company in connection with a Shareholder Transfer) shall be shared equally by the acquiring Shareholder(s) and the Transferor.

4.4     Tag-Along

(a)     If at any time following the Initial A Period, a holder of A Shares desires to transfer or otherwise dispose, in one or more transactions, of all or more than 25% of its A Shares to a prospective purchaser in a transaction, then the relevant holder of A Shares (the **Tag Offeror**) shall offer to include in such proposed transaction a number of Shares owned and designated by any holder of B Shares (each a **Tag Offeree**) in each case in accordance with the terms of this Article 4.4. Notwithstanding the foregoing, this Article 4.4 shall not be applicable to, and a holder of B Shares may transfer or otherwise dispose of their respective Shares without complying with any of the provisions of this Article 4.4 in connection with any transfer or other disposal.

(b)     The Tag Offeror shall cause the offer to the prospective purchaser to be reduced to writing (which writing shall include an offer to purchase or otherwise acquire the Shares from the Tag Offerees as required by this Article 4.4 and a time and place designated for the closing of such purchase, which time shall not be less than 20 Business Days after delivery of such notice and no more than 60 Business Days after such delivery date) and shall send written notice of such third party offer (the **Inclusion Notice**) to each of the Tag Offerees.

(c)     Each Tag Offeree shall have the right (the **Inclusion Right**), exercisable by delivery of notice to the Tag Offeror at any time within 15 calendar days after receipt of the Inclusion Notice, together with the Tag Offeror, to sell pursuant to such third party offer, and upon the terms and conditions set out in the Inclusion Notice, that number of Shares requested to be included by such Tag Offeree; provided that if the prospective purchaser is unwilling to purchase all the Shares requested to be sold by all exercising Tag Offerees together with the Tag Offeror, then each Tag Offeree shall have the right to sell pursuant to such third party offer, and upon the terms and conditions set out in the Inclusion Notice, a number of such Shares equal to such Shareholder's percentage shareholding in the Company at that time as provided in Article 4.4(d).

(d)     If any Tag Offeree has exercised its Inclusion Rights and the proposed third party transferee is unwilling to purchase all of the Shares proposed to be transferred by the Tag Offeror and all exercising Tag Offerees (determined in accordance with Article 4.4(c)), then the Tag Offeror and each exercising Tag Offeree shall reduce, on a pro rata basis, based on their respective percentage shareholdings in the Company, the amount of such Shares that each otherwise would have sold so as to permit the Tag Offeror and each exercising Tag Offeree to sell the number of Shares (determined in accordance with such reduced percentage shareholding in the Company) that the prospective purchaser is willing to purchase.

(e)     The Tag Offeror and the Tag Offerees shall sell to the prospective purchaser all, or at the option of the prospective purchaser, any part of the Shares proposed to be transferred by them, at not less than the price and upon terms and conditions, if any, not more favourable to the prospective purchaser than those in the Inclusion Notice at the time and place provided for the closing in the Inclusion Notice, or at such other time and place as the Tag Offeror, the Tag Offerees and the prospective purchaser shall agree.

(f)     Each Shareholder entitled to consent to the sale of the Shares to the prospective purchaser which is not a Shareholder pursuant to Article 4.4(e) shall give its prior consent to such sale of Shares in compliance with this Article 4.4(f).

(g)     Upon the closing of the sale of the Shares pursuant to this Article 4.4, the Tag Offeror and any Tag Offeree which has exercised its Inclusion Rights shall receive a proportion of the aggregate consideration from such sale of the Shares pursuant to the distribution waterfall set out in Article 19.7.

(h)     The Tag Offeror shall have the right to require the Company to cooperate fully with potential purchasers of its Shares by taking all customary and other actions required by the Tag Offeror or such potential purchasers, including making the Company's properties, books and records, and other assets reasonably available for inspection by such potential purchasers, establishing a data room including materials customarily made available to potential purchasers in connection with such processes and making its employees reasonably available for interviews and other due diligence activities, in each case subject to reasonable and customary confidentiality provisions.

4.5     Subject to the terms of this Article 4, Shares in the Company shall be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee.  The instrument of transfer shall also be signed by the transferee if registration as a holder of the shares imposes a liability to the Company on the transferee.  The instrument of transfer of a registered share shall be sent to the Company for registration.

4.6     Subject to the Memorandum, these Articles and to section 54(5) of the Act, the Company shall, on receipt of an instrument of transfer, enter the name of the transferee of the share in the register of members unless the directors resolve to refuse or delay the registration of the transfer for reasons that shall be specified in the resolution.  Where the directors pass such a resolution, the Company shall send to the transferor and the transferee a notice of the refusal or delay.    Notwithstanding anything contained in the Memorandum or Articles, the directors shall not decline to register any transfer of shares, nor may they suspend registration thereof where such transfer is:

(a)     to any mortgagee or chargee whose interest has been noted on the register of members;

(b)     by any such mortgagee or chargee, pursuant to the power of sale under its security; or

(c)     by any such mortgagee or chargee in accordance with the terms of the relevant security document.

4.7    The transfer of a registered share is effective when the name of the transferee is entered in the register of members.

**5    Mortgages of Shares and Charges over Shares**

5.1    Following the expiry of the Initial A Period or the Initial B Period, as applicable, members may mortgage or create a charge or other form of security over their shares.

5.2    The directors shall, at the written request of a member who has mortgaged or created a charge over his shares, enter in the register of members of the Company:

  (a)    a statement that such shares are mortgaged or charged;

  (b)    the name of the mortgagee or chargee (where such information has been stated by the member); and

  (c)    the date on which the statement and name are entered in the register of members.

**6    Transmission of Shares**

6.1    Subject to sections 52(2) and 53 of the Act, the executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his share, save that and only in the event of death, incompetence or bankruptcy of any member or members of the Company as a consequence of which the Company no longer has any directors or members, then upon the production of any documentation which is reasonable evidence of the applicant being entitled to:

  (a)    a grant of probate of the deceased's will, or grant of letters of administration of the deceased's estate, or confirmation of the appointment as executor or administrator (as the case may be, or analogous position in the relevant jurisdiction), of a deceased member's estate;

  (b)    the appointment of a guardian (or analogous position in the relevant jurisdiction) of an incompetent member;

  (c)    the appointment as trustee (or analogous position in the relevant jurisdiction) of a bankrupt member; or

  (d)    upon production of any other reasonable evidence of the applicant's beneficial ownership of, or entitlement to the shares,

  to the Company's registered agent in the British Virgin Islands together with (if so requested by the registered agent) a notarised copy of the share certificate(s) of the deceased, incompetent or bankrupt member, an indemnity in favour of the registered agent and/or appropriate legal advice in respect of any document issued by a foreign court, then the administrator, executor, guardian or trustee in bankruptcy (as the case may be) notwithstanding that their name has not been entered in the share register of the Company,

may by written resolution of the applicant, endorsed with written approval by the registered agent, be appointed a director of the Company and/or entered in the share register as the legal and/or beneficial owner of the shares.

6.2    Without limiting the foregoing, the production to the Company of any document which is reasonable evidence of:

(a)    a grant of probate of the will, or grant of letters of administration of the estate, or confirmation of the appointment as executor (or analogous position in the relevant jurisdiction), of a deceased member;

(b)    the appointment of a guardian (or analogous position in the relevant jurisdiction) of an incompetent member;

(c)    the trustee (or analogous position in the relevant jurisdiction) of a bankrupt member; or

(d)    the applicant's legal and/or beneficial ownership of the shares,

shall be accepted by the Company even if the deceased, incompetent member or bankrupt member is resident and/or domiciled outside the British Virgin Islands if the document is issued by a foreign court which had competent jurisdiction in the matter.  For the purposes of establishing whether or not a foreign court had competent jurisdiction in such a matter the directors may obtain appropriate legal advice.  The directors may also require an indemnity to be given by the executor, administrator, guardian, trustee in bankruptcy or the applicant.

6.3    Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors.  An application by any such person to be registered as a member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

6.4    Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

6.5    What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

**7    Acquisition of Own Shares**

7.1    The directors may, on behalf of the Company, subject to the written consent of all the members whose shares are to be purchased, redeemed or otherwise acquired, purchase, redeem or otherwise acquire any of the Company's own shares for such consideration as the directors consider fit, and either cancel or hold such shares as treasury shares.  Shares may be purchased or otherwise acquired in exchange for newly issued shares in the Company.

7.2     The directors shall not, unless permitted pursuant to the Act, purchase, redeem or otherwise acquire any of the Company's own shares unless immediately after such purchase, redemption or other acquisition:

(a)     the value of the Company's assets exceeds it liabilities; and

(b)     the Company is able to pay its debts as they fall due.

7.3     Sections 60 and 61 of the Act shall not apply to the Company.

## 8     Treasury Shares

8.1     Shares may only be held as treasury shares by the Company to the extent that the number of treasury shares does not exceed 50% of the shares of that class previously issued by the Company, excluding shares that have been cancelled.

8.2     The directors may dispose of any shares held as treasury shares on such terms and conditions as they may from time to time determine.

## 9     Meetings of Members

9.1     General meetings of the Company shall be held at least once every calendar year. Any Director or Shareholder holding at least 10% of the issued and outstanding Shares of the Company may call a general meeting of the Company. At least 21 calendar days' notice of each general meeting of the Company shall be given to the holders of the A Shares and to each holder of the B Shares unless in any particular case the holders of the A Shares, or, in the case of the holders of the B Shares, the holders of at least 50% of the issued and outstanding B Shares, otherwise agree in writing. The notice shall specify the date, time and place of the meeting. The notice must be accompanied by an agenda of all the business to be transacted at the meeting.

9.2     No general meeting of the Shareholders may proceed unless a meeting quorum is present at the start and throughout the meeting. Shareholders representing in the aggregate more than 50% of the total issued and outstanding Shares of the Company present by proxy or by duly authorised representative shall constitute a quorum and shall include as long as any B Shares remain outstanding, the holders of at least 50% of the issued and outstanding B Shares except where a greater quorum is required by law in which case such greater quorum shall apply. In the event that a quorum of the requisite holders of B Shares is not present, the meeting shall be adjourned by the chairman to a day not earlier than 5 Business Days and not later than 10 Business Days from the date of such meeting provided that 7 days notice of the meeting has been given to all Shareholders. The quorum for the adjourned meeting shall be attendance by one or more Shareholders representing more than 50% of the total issued and outstanding Shares of the Company present by proxy or by duly authorised representative except where a greater quorum is required by law in which case such greater quorum shall apply.

9.3     The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote. An instrument appointing a proxy shall be in such form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the

proxy, but must be in writing under the hand of the appointer unless the appointer is a corporation or other form of legal entity (other than one or more individuals holding as joint owner) in which case the instrument appointing a proxy shall be in writing under the hand of an individual duly authorised by such corporation or legal entity to execute the same.

9.4    If allowed by law or by the Articles, a general meeting of the Company may consist of a conference between the Shareholders some or all of whom are in different places, provided that each Shareholder who participates is able:

(a)    to hear each of  the other participating Shareholders addressing the meeting;

(b)    if it so wishes, to address all of the other participating Shareholders simultaneously; and

(c)    to review all relevant documentation concerning the resolutions or matters under consideration at the meeting,

whether directly, by conference telephone or by any other form of communications equipment (whether in use when the Articles are adopted or not) or by a combination of those methods. A meeting held in this way is deemed to take place at the place from where the chairman at the meeting participates, or if the chairman is not present, at a location in which at least one Shareholder is present and is agreed by all the participating Shareholders as the location of the meeting.

9.5    Subject to the Investor Reserved Matters, resolutions to be voted on at a general meeting shall be decided by simple majority of the issued and outstanding Shares represented by the votes cast except where a greater majority is required by law or by the Articles, by any agreement between the Shareholders or by any relevant legislation in which case such greater majority shall apply.

9.6    Subject to the Investor Reserved Matters, if any Shareholder has an Interest in any matter which requires that Shareholder's approval whether pursuant to the terms of these Articles or otherwise or if such matter is to be the subject of discussion at any meeting of Shareholders or if such a matter is to be the subject of a circular to Shareholders then that Shareholder shall be obliged to declare that Interest by giving written notice to the Company and the other Shareholders and, provided he has done so, shall be entitled to vote (and be counted in the quorum at a meeting) in relation to such matter.

9.7    Subject to the Memorandum or these Articles, an action that may be taken by members of the Company at a meeting of members may also be taken by Written Resolution.

**10    Jointly Held Shares**

10.1    Where shares are registered in the names of joint owners:

(a)    each registered owner may be present in person or by proxy at a meeting of members and may speak as a member;

(b)    if only one of them is present in person or by proxy, he may vote on behalf of all of them; and

(c)    if two or more are present in person or by proxy, they must vote as one.  If more than one joint owner votes in person or by proxy at any meeting of members or by Written Resolution, the vote of the joint owner whose name appears first among such voting joint holders in the share register shall alone be counted.

## 11    Corporations Acting by Representatives at Meetings

Any corporation or other form of corporate legal entity which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the members or any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual member of the Company.

## 12    Appointment and Removal of Directors

12.1    The first director or directors shall be appointed by the registered agent of the Company. Thereafter, the directors shall be appointed and removed in accordance with this Article 12. Sections 114(2) and 114(3) of the Act shall not apply to the Company.

12.2    For as long as the holders of the B Shares hold the Requisite B Percentage, the Board shall consist of not less than seven (7) and of up to ten (10) Directors of whom:

(a)    at least four and up to seven shall be A Directors; and

(b)    three shall be B Directors.

12.3    Up to seven A Directors may be nominated for appointment by the holders of, or from among the nominees designated by the holders of, the A Shares from time to time.

12.4    For as long as the holders of the B Shares hold the Requisite B Percentage, up to three B Directors may be nominated for appointment by the holders of, or from among the nominees designated by the holders of, the B Shares from time to time:

(a)    for as long as Lime Rock holds 35% or more of the issued and outstanding B Shares, Lime Rock shall have the right to nominate for appointment two B Directors and the Co-Investor, if any, holding the next largest number of B Shares shall have the right to nominate for appointment one B Director;

(b)    in the event that Lime Rock holds less than 35% of the issued and outstanding B Shares, the Co-Investor holding the next largest number of B Shares shall have the right to nominate for appointment two B Directors and Lime Rock shall have the right to nominate for appointment one B Director.

14

12.5    The Shareholder(s) nominating a Director shall have the right to remove from office any person so appointed and shall have the right to nominate another person in his place. The Shareholder(s) nominating a Director shall have the power to nominate a replacement if that Director's seat on the Board is vacated. A Shareholder nominating for due appointment a Director shall do so by way of written notice to the other Shareholders and the Company, following which the Board shall pass a resolution of directors approving and confirming his appointment.

12.6    For as long as the holders of the B Shares hold the Requisite B Percentage, the Shareholders shall procure that the holders of the A Shares and the holders of the B Shares' respective nominations for appointment, removal or replacement are effected.

12.7    The Directors shall not receive an annual director's fee or similar compensation for serving as a member of the Board of the Company or any of its Subsidiaries or committees thereof. The Directors shall be entitled to reimbursement from the Company of reasonable out-of-pocket expenses in connection with attending Board and committee meetings and fulfilling, in the case of Directors, Board duties, subject to such limitations as may be established by the Board (including at least one B Director for as long as the holders of the B Shares hold the Requisite B Percentage).

12.8    The Shareholder(s) removing any Director shall indemnify the Company against any liability arising as a result of that Director's removal from office.

12.9    A person shall not be appointed as a director of the Company unless he has consented in writing to be a director. Any appointment shall take effect from the date of receipt by the Company in writing of that new Director's consent to act in that position and any removal shall, unless the contrary intention appears, take effect from the date of notification of the Company by the relevant Shareholder in writing.

12.10   Each director holds office until:

(a)    his disqualification to act as a director under section 111 of the Act (on which his office as director shall be automatically terminated if he has not resigned in accordance with section 115(2) of the Act);

(b)    his death;

(c)    his resignation; or

(d)    the effective date of his removal by Resolution of Directors or Resolution of Members on nomination of the Shareholder that nominated him for appointment.

12.11   The following are disqualified for appointment as the director of the Company:

(a)    an individual who is under 18 years of age;

(b)    a person who is a disqualified person within the meaning of section 260(4) of the Insolvency Act, 2003;

(c)    a person who is a restricted person within the meaning of section 409 of the Insolvency Act, 2003; and

(d)    an undischarged bankrupt.

12.12   A director shall not require a share qualification, but nevertheless shall be entitled to attend and speak at any meeting of the directors and meeting of the members and at any separate meeting of the holders of any class of shares in the Company.

**13      Duties of Directors and Conflicts of Interests**

13.1    A director of the Company, in exercising his powers or performing his duties, shall act honestly and in good faith and in what the director believes to be in the best interests of the Company.

13.2    Notwithstanding the foregoing Article, if the Company is a wholly-owned subsidiary, a director of the Company may, when exercising powers or performing duties as a director, act in a manner which he believes is in the best interests of that Company's holding company (as defined in the Act) even though it may not be in the best interests of the Company.

13.3    A director shall exercise his powers as a director for a proper purpose and shall not act, or agree to the Company acting, in a manner that contravenes the Act or the Memorandum or Articles.

13.4    A director, when exercising powers or performing duties as a director, shall exercise the care, diligence, and skill that a reasonable director would exercise in the same circumstances taking into account, but without limitation:

(a)    the nature of the Company;

(b)    the nature of the decision; and

(c)    the position of the director and the nature of the responsibilities undertaken by him.

13.5    A director of the Company, when exercising his powers or performing his duties as a director, is entitled to rely upon the register of members and upon books, records, financial statements and other information prepared or supplied, and on professional or expert advice given, by:

(a)    an employee of the Company whom the director believes on reasonable grounds to be reliable and competent in relation to the matters concerned;

(b)    a professional adviser or expert in relation to matters which the director believes on reasonable grounds to be within the person's professional or expert competence; and

(c)    any other director, or committee of directors upon which the director did not serve, in relation to matters within the director's or committee's designated authority,

provided that the director:

16

(d)    acts in good faith;

(e)    makes proper inquiry where the need for the inquiry is indicated by the circumstances; and

(f)    has no knowledge that his reliance on the register of members or the books, records, financial statements and other information or expert advice is not warranted.

13.6    A director may hold any other office or position of profit under the Company (except that of auditor) in conjunction with his office of director, and may act in a professional capacity to the Company on such terms as to remuneration and otherwise as the directors shall approve.

13.7    A director may be or become a director or officer of, or otherwise be interested in any company promoted by the Company, or in which the Company may be interested, as a member or otherwise and no such director shall be accountable for any remuneration or other benefits received by him as director or officer or from his interest in such other company. The directors may also exercise the voting powers conferred by the shares in any other company held or owned by the Company in such manner in all respects as they think fit, including the exercise thereof in favour of any resolutions appointing them, or of their number, directors or officers of such other company, or voting or providing for the payment of remuneration to the directors or officers of such other company. A director may vote in favour of the exercise of such voting rights in the manner aforesaid notwithstanding that he may be, or be about to become, a director or officer of such other company, and as such in any other manner is, or may be, interested in the exercise of such voting rights in the manner aforesaid.

13.8    No director shall be disqualified by his office from contracting with the Company either as a buyer, seller or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any director shall be in any way interested be voided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement, by reason of such director holding that office or by reason of the fiduciary relationship thereby established, provided such director shall, immediately after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose such interest to the board of directors. For the purposes of this Article:

(a)    a director of the Company is not required to make such a disclosure if:

    (i)    the transaction or proposed transaction is between the director and the Company; and

    (ii)    the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on arm's length terms and conditions;

(b)    a disclosure to the board to the effect that a director is a member, director, officer or trustee of another named company or other person and is to be regarded as interested in any transaction which may, after the date of the entry or disclosure, be entered into with that company or person, is a sufficient disclosure of interest in relation to that transaction. Such a disclosure is not made to the board unless it is made or brought to the attention of every director on the board; and

(c) subject to section 125(1) of the Act, the failure by a director to comply with this Article does not affect the validity of a transaction entered into by the director or the Company.

13.9 A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

(a) vote on a matter relating to the transaction;

(b) attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

(c) sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction.

## 14    Powers of Directors

14.1 The day-to-day Business of the Company shall be managed by a Managing Director who may also be the chairman of the Board and who shall exercise all the powers of the Company save as otherwise provided in this Agreement or the Articles. Officers of the Company shall be elected by the Board and the Board may entrust to and confer upon any Director or officer of the Company any of the powers exercisable by it upon such terms and conditions consistent with applicable law and these Articles. The ultimate responsibility for business of the Company shall be with the directors (provided that a managing director, who may also be the chairman of the Board, may be appointed to manage the day-to-day activities of the Company) who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company, and may exercise all such powers of the Company necessary for managing and for directing and supervising, the business and affairs of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members, subject to any delegation of such powers as may be authorised by these Articles and permitted by the Act and to such requirements as may be prescribed by Resolution of the Members, but no requirement made by Resolution of the Members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

## 15    Delegation by the Board to Directors, Committees, Officers, Attorneys and Agents

15.1 The board of directors may entrust to and confer upon any director or officer any of the powers exercisable by it upon such terms and conditions and with such restrictions as it thinks fit, and either collaterally with, or to the exclusion of, its own powers, and may from time to time revoke, withdraw, alter or vary all or any of such powers. Subject to the provisions of section 110 of the Act, the directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit. Any committees so formed shall in the exercise of powers so delegated conform to any regulations that may be imposed on it by the directors or the provisions of the Act.

15.2 The directors have no power to delegate the following powers to a committee of directors:

(a) to amend the Memorandum or Articles;

18

(b)     to designate committees of directors;

(c)     to delegate powers to a committee of directors; (This and the preceding sub-Article do not prevent a committee of directors, where authorised by the directors, from appointing a sub-committee and delegating powers exercisable by the committee to the sub-committee);

(d)     to appoint or remove directors;

(e)     to appoint or remove an agent;

(f)     to approve a plan or merger, consolidation or arrangement;

(g)     to make a declaration of solvency for the purposes of section 198(1)(a) of the Act or approve a liquidation plan; or

(h)     to make a determination under section 57(1) of the Act that the Company will, immediately after a proposed distribution, satisfy the solvency test.

15.3    Where the directors of the Company delegate their powers to a committee of directors, they remain responsible for the exercise of that power by the committee, unless they believed on reasonable grounds that at all times before the exercise of the power that the committee would exercise the power in conformity with the duties imposed on directors of the Company by the Act.

15.4    The composition, quorum and voting requirements of meetings of the Board shall equally apply to meetings of any committee of the Board *mutatis mutandis.*

15.5    The directors of the Company may, by Resolution of Directors, appoint officers of the Company at such times as shall be considered necessary or expedient.   The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modifications in such duties as may be prescribed by the directors thereafter.

15.6    Any person may hold more than one office and no officer need be a director or member of the Company.   The officers shall remain in office until removed from office by the directors, whether or not a successor is appointed.

15.7    Any officer who is a body corporate may appoint any person as its duly authorised representative for the purpose of representing it and of transacting any of the business of the officers.

15.8    The directors may from time to time by power of attorney appoint any company, firm or person or body of persons to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Articles) and for such period and subject to such conditions as the directors think fit.

15.9    The directors may appoint any person, including a person who is a director, to be an agent of the company.   An agent of the Company has such powers and authority of the directors,

including the power and authority to affix the common seal of the Company, as are set forth in the Resolution of Directors appointing the agent, except that no agent has any power or authority with respect to the following:

(a)    to amend the Memorandum or Articles;

(b)    to change the registered office or registered agent;

(c)    to designate committees of directors;

(d)    to delegate powers to a committee of directors;

(e)    to appoint or remove directors;

(f)    to appoint or remove an agent;

(g)    to fix emoluments of directors;

(h)    to approve a plan of merger, consolidation or arrangement;

(i)    to make a declaration of solvency for the purposes of section 198(1)(a) of the Act or to approve a liquidation plan;

(j)    to make a determination under section 57(1) of the Act that the Company will, immediately after a proposed distribution, satisfy the solvency test as stipulated in section 56 of the Act; or

(k)    to authorise the Company to continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands.

15.10  Where the directors appoint any person to be an agent of the Company, they may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

15.11  The directors may at any time remove an agent and may revoke or vary a power conferred on him.

**16      Proceedings of Directors**

16.1   The Board shall meet as necessary to discharge its duties but in any case no less frequently that four times per year, unless decided otherwise by the Board.

16.2   A Director may at any time summon a meeting of the directors. Written notice of each Board meeting shall be given to each Director wherever he may be.  Such written notice shall be given at least seven calendar days prior to the date of such meeting unless in any particular case a majority of the Directors (including at least two A Directors and at least two B Directors) otherwise agree to a fewer number of calendar days; provided, however, that in no

20

event shall a Board meeting be held upon less that 24 hours' notice unless at least two A Directors and all of the B Directors agree in writing. The notice shall be accompanied by an agenda specifying in reasonable detail the matters to be discussed, together with all relevant papers for discussion at such meeting, including the most recent minutes of the meeting of the Board and monthly and quarterly financial information in respect of the Group (if available).

16.3    The quorum at meetings of the Board shall be four Directors including at least two A Directors and at least two B Directors. In the event that a quorum of Directors is not present due to non-attendance of one or more of the Directors, the meeting shall be adjourned by the chairman to a day not earlier than five Business Days and not later than 10 Business Days from the date of such meeting provided that seven calendar days' notice of the meeting has been given to each Director and that at such meeting the quorum shall be any four Directors.

16.4    In the event that any A Director is unable to attend a meeting (the **First A Director**), another A Director (the **Second A Director**) shall be entitled upon due instructions from the First A Director to act as an alternate for that First A Director on his behalf, to attend and vote at any such meeting at which the First A Director is not personally present and at the meeting to exercise and discharge all the functions, powers and duties of the First A Director.  In the event that any B Director is unable to attend a meeting (the **First B Director**), another B Director (the **Second B Director**) shall be entitled upon due instructions from the First B Director to act as an alternate for that First B Director on his behalf, to attend and vote at any such meeting at which the First B Director is not personally present and at the meeting to exercise and discharge all the functions, powers and duties of the First B Director.

16.5    Subject to the Board Reserved Matters in these Articles, resolutions of the Board shall be passed by a majority of the Directors present or represented at a quorate Board meeting and entitled to vote.

16.6    To the extent permitted by law, all acts done by a meeting of Directors, or of a committee of Directors, or by a person acting as a Director shall, notwithstanding that it be afterwards discovered that there was a defect in the appointment of any Director or that any of them were disqualified from holding office, or had vacated office, or were not entitled to vote, be as valid as if every such person had been duly appointed and was qualified and had continued to be a Director and had been entitled to vote.

16.7

(a)    A Resolution of Directors in writing which is signed or approved by the requisite number of Directors or such higher number that may be required under these Articles entitled to receive notice of a meeting of Directors or of a committee of Directors shall be as valid and effectual as if it had been passed at a meeting of Directors or (as the case may be) a committee of Directors duly called and constituted.

(b)    The resolution may be contained in one document or executed in counterparts, each signed or approved by the Directors who had voted on the same.

(b)    For the purposes of this Article 16.8, the approval of a Director may be given by letter, fax or scanned signed copy emailed in pdf format.

21

16.8    A meeting of the Board may consist of a conference between Directors some or all of whom are in different places provided that each Director who participates is able:

(a)    to hear each of the other participating Directors addressing the meeting; and

(b)    if he so wishes, to address all of the other participating Directors simultaneously,

whether directly, by conference telephone or by any other form of communications equipment (whether or not in use when this Agreement was executed) or by a combination of those methods.

16.9    A quorum is deemed to be present if the conditions of Articles 16.3 and 16.8 are satisfied in respect of at least four Directors.

16.10    A meeting held as described in Article 16.8 is deemed to take place at the place where the largest group of participating Directors is assembled or, if no such group is readily identifiable, at the place from where the chairman of the Board participates.

16.11    If a question arises at a meeting of Directors or of a committee of Directors as to the right of a Director to vote, the question may, before the conclusion of the meeting, be referred to the chairman of the Board and his ruling in relation to any Director other than himself shall be final and conclusive.

16.12    If so requested by the Investors, the Company shall make available to the relevant Investor copies of the minutes of meetings of the board of directors of the Company and each of its Subsidiaries within 14 days of the relevant board meeting.

16.13    Any Director who is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Directors and of transacting any of the business of the directors.

16.14    The Directors may elect a chairman (the **Chairman of the Board**) of their meeting and determine the period for which he is to hold office.  If no such Chairman of the Board is elected, or if at any meeting the Chairman of the Board is not present at the time appointed for holding the meeting, the directors present may choose one of their number to be Chairman of the Board for the meeting.  If the directors are unable to choose a Chairman of the Board, for any reason, then the longest serving director present at the meeting shall preside as the Chairman of the Board.  In case of an equality in votes the Chairman of the Board shall have a second or casting vote.

**17      Indemnification and Insurance**

17.1    Subject to the provisions of the Act and the subsequent provisions of this Article, the Company may indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a)      is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company;  or

(b)      is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

17.2      This Article applies only to a person who has acted honestly and in good faith and in what he believed to be the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful. The Company shall not indemnify a person who has not so acted, and any indemnity given to such a person is void and of no effect. A director acts in the best interests of the Company if he acts in the best interests of:

(a)      the Company's holding company; or

(b)      a shareholder or shareholders of the Company;

in either case, in the circumstances specified in the sub-Articles below, as the case may be.

17.3      The termination of any proceedings by any judgement, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

17.4      Expenses, including legal fees, incurred by a director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the director to repay the amount if it shall ultimately be determined that the director is not entitled to be indemnified by the Company in accordance with this Article.

17.5      Expenses, including legal fees, incurred by a former director in defending any legal, administrative or investigative proceedings may be paid by the Company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the former director to repay the amount if it shall ultimately be determined that the former director is not entitled to be indemnified by the Company in accordance with this Article and upon such other terms and conditions, if any, as the Company deems appropriate.

17.6      The indemnification and advancement of expenses provided by, or granted pursuant to, this Article is not exclusive of any other rights to which the person seeking indemnification or advancement of expenses may be entitled under any agreement, resolution of members, resolution of disinterested directors or otherwise, both as to acting in the person's official capacity and as to acting in another capacity while serving as a director of the Company.

17.7      The Company may purchase and maintain insurance in relation to any person who is or was a director of the Company, or who at the request of the Company is or was serving as a director of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under the foregoing Article.

## 18      Company Seal and Entry into Contracts and Deeds

18.1    The directors shall provide for the safe custody of the common seal of the Company.  The common seal when affixed to any instrument (save for a share certificate in accordance with these Articles) shall be witnessed by a director or officer of the Company or any other person so authorised from time to time by the directors.

18.2    A contract may be entered into by the Company as follows:

(a)      a contract that, if entered into by an individual, would be required by law to be in writing and under seal, may be entered into by or on behalf of the Company in writing under the common seal of the Company, or executed by or on behalf of the Company by a director or an authorised agent of the Company, and may be varied or discharged in the same manner;

(b)      a contract that, if entered into by an individual, would be required by law to be in writing and signed, may be entered into by or on behalf of the Company in writing and signed by a person acting under the express or implied authority of the company, and may be varied or discharged in the same manner; and

(c)      a contract that, if entered into by an individual, would be valid although entered into orally, and not reduced to writing, may be entered into orally by or on behalf of the Company by a person acting under the express or implied authority of the Company, and may be varied or discharged in the same manner.

18.3    Notwithstanding the foregoing Article, an instrument is validly executed by the Company as a deed, or an instrument under seal, if it is either:

(a)      sealed with the common seal of the Company and witnessed by a director of the Company and/or such other person who is authorised by the Memorandum or Articles to witness the application of the Company's seal; or

(b)      expressed to be, or is expressed to be executed as, or otherwise makes clear on its face that it is intended to be, a deed and it is signed by a director and/or by a person acting under the express or implied authority of the Company.

## 19      Distributions

19.1    Subject to the provisions of the Act and the following Articles, the directors of a Company may, by Resolution of Directors, authorise a distribution by the Company at a time, and of an amount, to be distributed in accordance with the terms of these Articles (unless otherwise agreed between and amongst the Shareholders) if they are satisfied, on reasonable grounds that, immediately after the distribution, the value of the Company's assets will exceed the Company's liabilities and the Company is able to pay its debts as they fall due.

19.2    No distribution shall be paid on those shares which are held by the Company as treasury shares at the date of declaration of the distribution.

19.3   If several persons are registered as joint holders of any share, any of them may give effectual receipt for any distribution or other monies payable on or in respect of the share.

19.4   Notice of any distribution that may have been declared shall be given to each member in manner hereinafter mentioned and all distributions unclaimed for three years after having been declared may be forfeited by the directors for the benefit of the Company.

19.5   No distribution shall bear interest against the Company.

19.6   The Company may, to the extent permitted by law and subject to the Company's cash requirements and the Budget, distribute by way of dividend in respect of each Financial Year a percentage of the Post-tax Profits of the Company for that Financial Year as the Shareholders approve in accordance with the Investor Reserved Matters and in proportion to the number of shares held by each Shareholder (except for the C Share, which shall have the rights attributed to the C Share for distributions under Article 19.7(b)(ii) and Article 20, but no rights to dividends under this Article 19.6).

19.7   In the event of the consummation of a sale or other disposal of all or substantially all of the Shares of the Company (whether in one transaction or in a series of related transactions but excluding an IPO) or a sale of all or substantially all of the assets of the Company or the liquidation or dissolution following the bankruptcy, insolvency or winding up of the Company, either voluntarily or involuntarily, the Company and the Shareholders agree to make distributions to the Shareholders in the following manner:

   (a)   in the event that the aggregate equity capital return is less than or equal to the Target Amount:

      (i)   the holders of the B Shares shall be entitled to receive, prior and in preference to any distribution of any of the assets or funds of the Company to the other Shareholders in the case of the holders of the B Shares, an amount per B Share (the **Class B Distribution Preference**) equal to the sum of (y) 1.6 x the Capital Invested divided by the total number of issued and outstanding B Shares; and (z) an amount equal to declared but unpaid dividends on such B Shares, if any (each to be calculated up to and including the date of the return of capital);

      (ii)   after the distributions described in Article 19.7(a)(i), the holders of the A Shares shall be entitled to a catch-up pursuant to which funds or assets of the Company available for distribution shall be distributed ratably among the holders of the A Shares until the holders of the A Shares have received aggregate distributions per A Share equal to the per Share distribution made to the holders of the B Shares in respect of their B Shares as set out in Article 19.7(a)(i) (the **Catch-Up**); and

      (iii)   after the distributions described Articles 19.7(a)(i) and 19.7(a)(ii) have been paid in an amount equal to the Class B Distribution Preference and the Catch-Up, the balance of the funds available for distribution by the Company, if any shall be distributed by the Company to the holders of the A Shares and the holders of the B Shares in proportion to the number of Shares owned by each such Shareholder (*pari passu* as if the same constituted one class of shares); and

25

(b)    in the event that the aggregate equity capital return is in excess of the Target Amount, the funds available for distribution by the Company shall be distributed by the Company in the following manner:

    (i)    the holders of the A Shares and the holders of the B Shares shall be entitled to receive 96.5% of the funds available for distribution by the Company in proportion to the number of Shares held by each holder of A Shares and each holder of B Shares (*pari passu* as if the same constituted one class of shares); and

    (ii)    the holder of the C Share shall be entitled to receive 3.5% of the funds available for distribution by the Company.

19.8    Whenever the distribution provided for in Article 19.7 shall be payable in property other than cash, the value of such distribution shall be the fair market value of such property as determined in good faith by the Board; provided, however, that any securities to be delivered to the Shareholders shall be valued as follows:

(a)    securities not subject to restrictions on free marketability:

    (i)    if traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30) day period ending three (3) days prior to the date of distribution;

    (ii)    if actively traded over-the-counter, the value shall be deemed to be the average of the closing bid prices over the 30-day period ending three (3) days prior to the date of distribution; and

    (iii)    if there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board; and

(b)    securities subject to restrictions on free marketability shall be valued at an appropriate discount from the market value determined as above in Article 19.8(a)(i), 19.8(a)(ii) or 19.8(a)(iii), to reflect the approximate fair market value thereof, as determined in good faith by the Board.

## 20    Automatic Conversion of the C Share

20.1    *Automatic Conversion*: Subject to the terms of this Article 20, in the event that the Company consummates an IPO of any class of its Shares (the "**Listed Shares**"), then the C Share shall automatically be converted into such number of fully paid non-assessable Shares of the same class as the Listed Shares, which would be equal to, if fully converted, 3.5% of the total issued and outstanding Shares of the Company immediately prior to the closing of an IPO and conversion of the C Share (the "**Conversion Shares**").

20.2    *Conversion Mechanics*: In the event of a conversion pursuant to Article 20.1, at least three Business Days before the date of the closing of an IPO, the holder of the C Share to be converted shall deliver the share certificate (or an indemnity in a form reasonably satisfactory to the Directors for any lost share certificate in accordance with Article 1.3) for the C Share

being converted to the Company at its registered office for the time being. Thereupon, the Company shall promptly issue and register in the name of the holder of the C Share the Conversion Shares to which such holder is entitled immediately prior to the date of the closing of an IPO (subject to adjustment to take account of any sub-division, consolidation or re-classification of the Shares at any time before a conversion) and which rank pari passu in all respects with the existing Shares.

20.3    Such conversion shall be deemed to have been made immediately prior to the date of closing of an IPO. The holder of the C Share entitled to receive the Conversion Shares issuable immediately prior to such conversion shall be treated for all purposes as the record holder of such Conversion Shares on such date.

20.4    The conversion of the C Share to Conversion Shares, together with the procedure in respect thereto, each as contemplated in this Article 20, shall at all times be subject to the listing requirements and/or listing rules of any applicable stock exchange or listing authority in respect of a proposed IPO. Each of the Company and the Shareholders acknowledges and agrees to use its best endeavours, to the extent that the terms of this Article 20 are incompatible with any listing requirements, to amend the terms of these Articles accordingly.

## 21    Company Records

21.1    The Company shall keep records that:

(a)    are sufficient to show and explain the Company's transactions; and

(b)    will, at any time, enable the financial position of the Company to be determined with reasonable accuracy.

21.2    The Company shall maintain accurate and complete accounting and other financial records and shall procure that such accounting records are, during normal business hours and upon reasonable notice, available for inspection by each Shareholder or its respective authorised representatives holding at least 5% of the Company's Shares.

21.3    The Company shall keep the following records at the office of its registered agent or at such other place or places, within or outside the British Virgin Islands, as the directors may determine:

(a)    minutes of all meetings and all resolutions of members and of classes of members; and

(b)    minutes of all meetings and all resolutions of directors and committees of directors.

21.4    Where any such records are kept at a place other than at the office of the Company's registered agent, the Company shall provide the registered agent with a written record of the physical address of the place or places at which the records are kept.  Where the place at which any such records is changed, the Company shall provide the registered agent with the physical address of the new location of the records within fourteen days of the change of location.

21.5    The Company shall keep a register to be known as a register of directors containing the names and addresses of the persons who are directors of the Company, the date on which each person whose name is entered in the register was appointed as a director of the Company, the date on which each person named as a director ceased to be a director of the Company, and such other information as may be prescribed from time to time by law.

21.6    The Company shall maintain an accurate and complete register of members showing the full names and addresses of all persons holding registered shares in the Company, the number of each class and series of registered shares held by such person, the date on which the name of each member was entered in the register of members and where applicable, the date such person ceased to hold any registered shares in the Company.

21.7    The Company shall keep the following at the office of its registered agent:

(a)    the Memorandum and Articles of the Company;

(b)    the register of members maintained in accordance with these Articles or a copy of the register of members;

(c)    the register of directors maintained in accordance with these Articles or a copy of the register of directors;

(d)    copies of all notices and other documents filed by the Company in the previous ten years;

(e)    a copy of the register of charges kept by the Company pursuant to section 162(1) of the Act; and

(f)    an imprint of the common seal.

21.8    Where the Company keeps a copy of the register of members or the register of directors at the office of its registered agent, it shall:

(a)    within 15 days of any change in the register, notify the registered agent, in writing, of the change; and

(b)    provide the registered agent with a  written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

(c)    Where the place at which the original register of members or the original register of directors is changed, the Company shall provide the registered agent with the physical address of the new location of the records within 14 days of the change of location.

21.9    The records, documents and registers required by these Articles shall be open to the inspection of the directors at all times.

28

21.10   The directors shall from time to time determine whether and to what extent and at what times and places and under what conditions the records, documents and registers of the Company or any of them shall be open to the inspection of members not being directors, and no member (not being a director) shall have any right to inspect any records, documents or registers of the Company except as conferred by the Act or authorised by a Resolution of Directors.

## 22      Audit

22.1    The directors may by a Resolution of Directors call for the accounts of the Company to be examined by an Auditor or Auditors to be appointed by them at such remuneration as may from time to time be agreed.

22.2    The auditor may be a member of the Company but no director or officer shall be eligible during his continuance in office.

22.3    Every auditor of the Company shall have a right of access at all times to the books of accounts of the Company, and shall be entitled to require from the officers of the Company such information and explanations as he thinks necessary for the performance of his duties.

22.4    The report of the auditor shall be annexed to the accounts upon which he reports, and the auditor shall be entitled to receive notice of, and to attend, any meeting at which the Company's audited profit and loss account and/or balance sheet is to be presented.

## 23      Notices

23.1    Any notice, information or written statement required to be given to members shall be served by mail (air-mail service if available) addressed to each member at the address shown in the share register.

23.2    All notices directed to be given to the members shall, with respect to any registered shares to which persons are jointly entitled, be given to whichever of such persons is named first in the share register, and notice so given shall be sufficient notice to all the holders of such shares.

23.3    Any notice, if served by post, shall be deemed to have been served within ten days of posting, and in proving such service it shall be sufficient to prove that the letter containing the notice was properly addressed and mailed with the postage prepaid.

## 24      Continuation

The Company may, by a Resolution of Directors or by a Resolution of Members, continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

## 25      Winding Up

25.1    The Company may be voluntarily liquidated under Part XII of the Act if it has no liabilities and it is able to pay its debts as they become due.  A liquidator may, subject to the terms of the Act, be appointed by a Resolution of Directors or by a Resolution of Members.

25.2    If the Company shall be wound up, the liquidator may, in accordance with Article 19.7, divide amongst the members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any such property to be divided as aforesaid and may determine how such division shall be carried out as between the members or different classes of members.   The liquidator may vest the whole or any part of such assets in trustees upon such trust for the benefit of the contributors as the liquidator shall think fit, but so that no member shall be compelled to accept any shares or other securities whereon there is any liability.



We, Rawlinson & Hunter Limited of Woodbourne Hall, PO Box 3162, Road Town, Tortola, British Virgin Islands in our capacity as registered agent for the Company hereby apply to the Registrar for the incorporation of the Company this 15th day of September 2008.

Incorporator

(Sgd)  Lori-Jean Stevens
_____
Lori-Jean Stevens
Authorised Signatory
Rawlinson & Hunter Limited

